UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| IMS HEALTH CORP., ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:07-cv-00127-JAW |
| | ) | |
| WILLIAM J. SCHNEIDER, | ) | |
| ATTORNEY GENERAL OF THE | ) | |
| STATE OF MAINE, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR ATTORNEYS' FEES**

Following their First Amendment victory, the Plaintiffs filed a motion and supplemental motion, requesting that the Court order the state of Maine to pay them $1,307,252.15 in attorneys' fees, expenses, and costs. The Court awards $678,189.64 in fees and expenses.

## I.   INTRODUCTION

Under the law, the Plaintiffs in this case are clearly entitled to an award of attorneys' fees against the state of Maine. Congress enacted 42 U.S.C. § 1988 to ensure "effective access to the judicial process for persons with civil rights grievances." *Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989) (citation omitted). In this case, in 2007, the Maine Legislature enacted a statute that would have had a profound, potentially devastating impact on the Plaintiffs' businesses. In seeking to have the statute declared an unconstitutional infringement of their First Amendment right to free speech, the Plaintiffs were not merely fighting for their economic survival, they were also seeking more generally to vindicate the

preeminence of the First Amendment over a legislative enactment.  Through the determined efforts of their attorneys, the Plaintiffs attained a resounding victory, as the state of Maine capitulated in the face of a decision by the United States Supreme Court and agreed to allow this Court to enter a judgment that effectively voided the statute as unconstitutional.

Not that it was easy.  The Plaintiffs staged this legal battle in three states, three federal district courts, two circuit courts of appeal, and took the fight all the way to the United States Supreme Court.  The issues were sophisticated and the facts and the law were complicated.  Nor was the outcome a forgone conclusion.  On the way to resolution, federal judges arrived at markedly different conclusions about similar legal questions.  The district courts in New Hampshire and Maine and the district court in Vermont came down on opposite sides, as did the First and Second Circuits.  It took the First Circuit sixty-four pages (including a dissent) to rule on *Ayotte*, the New Hampshire companion case, and forty-two pages (including a concurrence) to resolve the appeal of this case.  *See IMS Health Inc. v. Ayotte*, 550 F.3d 42 (1st Cir. 2008); *IMS Health Inc. v. Mills*, 616 F.3d 7 (1st Cir. 2010).  Judges in the Second Circuit divided over the issue, with two judges ruling against the Vermont version of the statute and one dissenting in favor of its constitutionality. *See IMS Health Inc. v. Sorrell*, 630 F.3d 263 (2d Cir. 2010).  Finally, in ruling in the Plaintiffs' favor, the Supreme Court itself was divided, with six justices in the majority and three in dissent.  *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011).

Furthermore, throughout the lawsuit, the Plaintiffs faced an able and diligent foe in the Maine Attorney General's Office.  In short, this was no run-of-the-mill matter and the Plaintiffs' counsel knew they had to present their very best case in order to prevail, not only because the legal issues were challenging and nuanced but also because failure threatened the very existence of their clients' businesses.

No doubt, the Plaintiffs themselves benefitted mightily from their victory. The Maine taxpayer may wonder why it should be that commercial businesses with the presumed wherewithal to pay their lawyers should be allowed to force the citizens of Maine to foot the bill.  The brief answer is that the Plaintiffs won more than a commercial victory; they won a victory for the First Amendment, and Congress has allowed fee-shifting from private plaintiffs to the public in a limited number of cases where the vindication of a right, even though it confers a private advantage, is presumed to benefit the public at large.  *See Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 295 (1st Cir. 2001) (noting that the ruling in that case "clearly benefitted both the parties and the public as a whole").

Finally, although the Maine Legislature had a perfect right to enact the Maine variation of the New Hampshire law, it did so in the shadow of an opinion from Judge Paul Barbadoro of the United States District Court for the District of New Hampshire, voiding as unconstitutional a similar New Hampshire law. Thus, the Maine Legislature enacted its variation with certain knowledge that the Plaintiffs would attack it in federal court in Maine just as they had successfully

done in New Hampshire, and the Legislature thereby ran the risk that this day would come.

## II.   STATEMENT OF FACTS

### A.   Case Background[1]

Within this Country's Byzantine health care delivery system, there are many niche players.  One is the prescription drug information intermediaries (PDIIs), companies that collect, aggregate, and analyze mountains of prescribing information from physicians and pharmacists, making the data useful to government agencies, academic institutions, health insurance companies, and others.  "Others" includes the prescriptive medicine arm of the pharmaceutical industry, which must rely on health care providers to direct patients to its products. The pharmaceutical industry therefore has a keen economic interest in learning about the prescribing patterns of health care providers and in obtaining and using the data the PDIIs generate.  That pharmaceutical companies have access to individual physicians' prescribing patterns comes as an unpleasant surprise to some physicians, who have a queasy sense that the availability of this data violates their privacy and, by extension, the privacy of their patients.  In response to concerns from health care providers, state legislatures began to enact laws restricting the ability of PDIIs to collect, analyze and sell the information.

New Hampshire took the lead.  In 2006, the New Hampshire Legislature enacted a statute that prohibited the transmission or use of patient-identifiable and

---

[1]     For a fuller discussion of the factual background of the substantive dispute, and of prescription drug information intermediaries, see this Court's earlier opinion at *IMS Health Corp. v. Rowe*, 532 F. Supp. 2d 153, 158–66 (D. Me. 2008).

prescriber-identifiable data for most commercial purposes. *See IMS Health Inc. v. Ayotte*, 550 F.3d at 45; 2006 N.H. Laws § 328, codified at N.H. REV. STAT. ANN. §§ 318:47-f, 318:47-g, 318-B:12(IV).

Maine was next. In 2007, the Maine Legislature enacted An Act to Amend the Prescription Privacy Law (the Law), 2007 Me. Laws 460 (codified as amended at 22 M.R.S. §§ 1711-E, 8704, 8713), which was to become effective on January 1, 2008. In brief, the Law allowed Maine prescribers of prescriptive medicine to opt out of providing their prescribing information to the PDIIs. Later in 2007, the state of Vermont followed suit with its own version, adopting an opt-in approach. *See* Vt. Acts No. 80, § 17 (2007) (codified at VT. STAT. ANN. tit. 18, § 4631(a)).

Perceiving a direct threat to their business, the PDIIs resorted to litigation to block the laws, claiming that the laws unconstitutionally violated their right to free commercial speech. Again, New Hampshire was first. Two PDIIs filed suit in the United States District Court for the District of New Hampshire and on April 30, 2007, Judge Paul Barbadoro issued an extensive opinion, concluding that the New Hampshire law violated the First Amendment and granting the PDIIs' request for declaratory judgment and a permanent injunction. *See IMS Health Inc. v. Ayotte*, 490 F. Supp. 2d 163 (D.N.H. 2007). The New Hampshire Attorney General appealed to the Court of Appeals for the First Circuit.

Meanwhile, in Maine, on August 29, 2007, three PDIIs filed a complaint in this Court and moved, the next day, for a preliminary injunction against enforcement of the law, claiming that it violated the First Amendment. *See IMS*

*Health Corp. v. Rowe*, 1:07-cv-00127-JAW, *Compl.* (ECF No. 1); *Pls.' Mot. for Prelim. Inj.* (ECF No. 5). After a two-day evidentiary hearing and extensive briefing, this Court issued an order on December 21, 2007, granting the PDIIs' motion for preliminary injunction. *See IMS Health Corp. v. Rowe*, U.S. Dist. LEXIS 94268 (D. Me. Dec. 21, 2007), *amended by IMS Health Corp. v. Rowe*, 532 F. Supp. 2d 153 (D. Me. 2008). The Maine Attorney General appealed to the First Circuit, but its appeal was stayed pending resolution of the New Hampshire appeal.

On November 18, 2008, the First Circuit reversed the New Hampshire district court and vacated its injunction. *See IMS Health Inc. v. Ayotte*, 550 F.3d 42 (1st Cir. 2008). On August 4, 2010, the First Circuit reversed this Court's judgment and remanded the case with instructions to dismiss it with prejudice. *IMS Health Inc. v. Mills*, 616 F.3d 7 (1st Cir. 2010).[2] In accordance with the First Circuit's ruling, this Court issued an Order of Dismissal on Remand and an Amended Judgment of Dismissal on October 13, 2010. *Order of Dismissal on Remand* (ECF No. 99); *Am. J. of Dismissal* (ECF No. 101).

As the Maine and New Hampshire cases were being resolved in the First Circuit, the Vermont case proceeded. On April 23, 2009, Judge Garvan Murtha of the United States District Court for the District of Vermont issued an order denying the Plaintiffs' motions for declaratory relief, injunctive relief, and summary judgment. *IMS Health Inc. v. Sorrell*, 631 F. Supp. 2d 434, 464 (D. Vt. 2009). The PDIIs appealed this decision to the Court of Appeals for the Second Circuit. The

---

[2]      The Defendant's name was changed from Stephen Rowe, once the Maine State Attorney General, to Janet Mills, the then-current Maine State Attorney General. The Defendant's name has since changed again, to William J. Schneider, the current incumbent.

Second Circuit disagreed with Judge Murtha and the First Circuit and, on November 23, 2010, reversed.  *See IMS Health Inc. v. Sorrell*, 630 F.3d 263 (2d Cir. 2010).

The circuit split primed the common issues for resolution by the United States Supreme Court, and on January 7, 2011, the Supreme Court granted a petition for writ of certiorari in the Vermont case.  *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 857 (2011).  On June 23, 2011, the Supreme Court issued its opinion, affirming the judgment of the Second Circuit.  *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2672 (2011).  The Supreme Court decision had a domino effect on the New Hampshire and Maine cases.  On August 3, 2011, the parties to the Maine litigation filed a stipulation with the First Circuit Court of Appeals, agreeing that the case should be remanded to this Court with instructions to vacate its Order of Dismissal and Amended Judgment.  On August 4, 2011, the First Circuit issued an Order consistent with this stipulation.  *Order of Ct.* (ECF No. 105).  On September 15, 2011, the Court issued an Order based on stipulations of the parties, entering judgment for the Plaintiffs on Count I and dismissing Counts II, III, and IV of the Plaintiffs' Complaint.  *Order on Remand* (ECF No. 116).  On October 7, 2011, Judge Barbadoro reinstated his May 7, 2007, judgment.  *See IMS Health Inc. v. Ayotte*, No. 06-cv-280-PB, 2011 U.S. Dist. LEXIS 116595, *3 (Oct. 7, 2011).

### B.   Procedural History

In its September 15, 2011 Order, the Court retained "jurisdiction to the extent permitted by the Federal Rules of Civil Procedure and the Local Rules of this

Court to determine entitlement and amount of attorney's fees, expenses, and costs, if any, to be awarded to plaintiffs." *Order on Remand* at 2. On January 11, 2012, the Plaintiffs filed a motion for attorneys' fees and expenses, asking for a total award of $1,189,942.14. *Pls.' Mot. for Att'ys' Fees and Expenses and for an Award of Costs* (ECF No. 124) (*Pls.' Mot.*). On February 29, 2012, the state of Maine responded in opposition. *Def.'s Opp'n to Pls.' Mot. for Att'ys' Fees and Expenses and an Award of Costs* (ECF No. 129) (*Def.'s Opp'n*). On April 4, 2012, the Plaintiffs replied. *Reply in Support of Pls.' Mot. for Att'ys' Fees, Expenses, and Costs* (ECF No. 132) (*Pls.' Reply*). Also on April 4, 2012, the Plaintiffs moved for oral argument; on April 6, 2012, the State objected. *Req. for Hr'g on Pls.' Mot. for Att'ys' Fees, Expenses, and Costs* (ECF No. 133); *Def.'s Opp'n to Pls.' Req. for Hr'g on Their Mot. for Att'ys' Fees and Expenses and for an Award of Costs* (ECF No. 134).

The Plaintiffs claim for attorneys' fees is based upon the application of 42 U.S.C. § 1988 and on March 21, 2012, a three-judge panel of the United States District Court for the District of Maine issued a significant opinion on the award of attorneys' fees in a § 1988 case. *See DeSena v. LePage*, 847 F. Supp. 2d 207 (D. Me. 2012). At the Court's nudging, the parties filed supplemental memoranda as to the impact, if any, of *DeSena* on the Plaintiffs' motion. *Pls.' Initial Br. Regarding De[S]ena v. LePage* (ECF No. 135) (*Pls.' DeSena Br.*); *Def.'s Br. Regarding Applicability of DeSena v. LePage* (ECF No. 136) (*Def.'s DeSena Br.*); *Pls.' Reply Br. Regarding De[S]ena v. LePage* (ECF No. 137) (*Pls.' DeSena Reply*).

Finally, on July 20, 2012, the Plaintiffs filed a notice of supplemental authority and a motion for a supplemental award. *Pls.' Notice of Supplemental Authority* (ECF No. 138); *Pls.' Mot. for Supplemental Award of Att'y's Fees & Expenses* (ECF No. 139) (*Pls.' Supplemental Mot.*). The state of Maine responded to the motion for supplemental award on August 1, 2012. *Def.'s Opp'n to Pls.' Mot. for Supplemental Award of Att'ys' Fees and Expenses* (ECF No. 140) (*Def.'s Supplemental Opp'n*). The Plaintiffs replied on August 7, 2012. *Pls.' Reply in Support of Mot. for Supplemental Award of Att'y's Fees & Expenses* (ECF No. 141) (*Pls.' Supplemental Reply*).

### C.    New Hampshire and Vermont

The federal district courts in New Hampshire and Vermont resolved the attorney's fee question in markedly different ways. In New Hampshire, the parties agreed to bear their own attorneys' fees, costs, and expenses. *See IMS Health Inc. v. Ayotte*, No. 06-cv-280-PB, 2011 U.S. Dist. LEXIS 116595, at *3 (D.N.H. Oct. 7, 2011) ("By agreement of the parties, each party shall bear their own attorneys' fees, costs, and expenses."). In Vermont, by contrast, Judge Murtha awarded the Plaintiffs a total of $2,137,050 in attorney's fees and expenses, roughly half of the $4,100,545 sought. *See IMS Health Inc. v. Sorrell*, No. 1:07-cv-188-jgm, 2012 U.S. Dist. LEXIS 99105, *3 (D. Vt. July 17, 2012).

## III.   THE PARTIES' POSITIONS

### A.    The Plaintiffs' Position

The Plaintiffs contend that they are the "prevailing parties" for purposes of an attorney's fee award under § 1988. *Pls.' Mot.* at 20.[3]  They say that it is "beyond dispute" that they prevailed in this case: they sought to have the Maine Law declared unconstitutional and the Court's September 15, 2011, Judgment granted them the relief they sought. *Id.* at 21.

Next, they maintain that the fees they seek are reasonable. *Id.* at 22. First, they assert that they were successful on their "primary claim," namely the First Amendment issue. *Id.*  They argue that the Court "should reject any argument the Attorney General may make that the fee award should be reduced to account for the voluntarily dismissed claims." *Id.* at 23.  They represent that they have made "a conscientious effort to exclude any fees for work performed exclusively on the dismissed claims from their fee application." *Id.*  They also assert that the number of hours they spent on the case is reasonable. *Id.* at 24–28.  In addition, they seek to justify their hourly rates and, in fact, contend that the Court should enhance the rates in light of the significance of the vindicated rights and the delay that their clients have experienced in obtaining reimbursement for costs and expenses. *Id.* at 28–34.  Finally, they defend their costs and expenses as reasonable. *Id.* at 35–36.

### B.    The State's Response

Describing the Plaintiffs' request as a "kingly sum," the State opposes the Plaintiffs' motion and urges the Court to "deny the motion outright as unreasonably

---

[3]    The pagination in the Plaintiffs' motion differs from the pagination in the ECF filing; the Court uses the ECF pagination.

excessive." *Def.'s Opp'n* at 2.[4]  To the extent the Court grants the motion, the State contends the hourly fees should be reduced by 80% to reflect "overstaffing," "duplication," and work "spent on failed claims."  *Id.*  In addition, the State maintains that the hourly rates should be reduced "to those of lawyers of similar skill and experience in this district."  *Id.*

In support of its argument that the Court should deny the motion altogether, the State asserts that the Plaintiffs have "failed to make a good faith effort to exclude hours that are excessive, redundant, or unnecessary."  *Id.* at 9.  The State says that "[t]his case was resolved without discovery or summary judgment motions, and involved a 2-day PI hearing that largely repeated what plaintiffs and their counsel did in *Ayotte*."  *Id.*  The State also disputes the length of time that the Plaintiffs were actively involved in this litigation, maintaining that this case "was dormant for most of its existence."  *Id.* at 10.

Next, the State says that if the Court awards any fees, it should reduce them "drastically."  *Id.*  First, the State attacks alleged "overstaffing," counting up 21 lawyers and 15 paralegals who submitted bills on this case.  *Id.* at 11.  The State points out that it defended the case using only three lawyers, and urges the Court to limit the award of fees to just Messrs. Montgomery, Ash and Julin (or Goldstein for appeal purposes).  *Id.*  The State makes particular objections to some of the billed time, which it contends is excessive.  *Id.* at 11–12.  Second, the State urges the Court to exclude time that duplicated the time Plaintiffs' counsel spent in the *Ayotte*

---

[4]     The pagination in the State's memorandum differs from the pagination in the ECF filing; the Court uses the ECF pagination.

case. *Id.* at 12–17.  Third, the State objects to what it calls "redundancy," where lawyers bill for consulting each other, where multiple lawyers billed to review the same document, where multiple lawyers contributed to the same memorandum or brief, and where esoteric or extraneous work was billed.  *Id.* at 17–22.  The State specifically objects to any time the lawyers spent dealing with the press, to time spent on vaguely described tasks, and to duplicated entries.  *Id.* at 22–23. Next, the State protests the lawyers' hourly rates, which it terms "exorbitant."  *Id.* at 23–27. Finally, the State objects to travel time, the 320 hours billed by paralegals, time spent on "non-core" tasks, time spent on failed claims, and certain expenses.  *Id.* at 27–31.

### C.    The Plaintiffs' Reply

The Plaintiffs decry the State's proposal either to deny their fee application or to slash their bills to just 11% of the requested fees. *Pls.' Reply* at 6.[5]  First, they dispute the State's contention that the Court should deny the fees altogether if it finds that a part of the bill is unwarranted, noting that such draconian relief should be used sparingly and that they achieved a "landmark" victory in the United States Supreme Court that saved "a multi-billion dollar industry."  *Id.* at 6–7.  Next, they point out that the state of Maine enacted its version of the Law in the face of a federal court decision striking down as unconstitutional a neighboring state's companion law. *Id.* at 8.  The Plaintiffs say that Maine had to know that its version of the Law would be challenged and that the state of Maine vigorously defended the

---

[5]     The pagination in the Plaintiffs' memorandum differs from the pagination in the ECF filing; the Court uses the ECF pagination.

legality of its version.  *Id.*  They defend the use of associates and others in assisting in the preparation of this complex case.  *Id.* at 8–10; 13–16.  They reject the State's contention that they are billing for work duplicated in *Ayotte* and deny that their work was redundant.  *Id.* at 10–14.  As to the unsuccessful claims, the Plaintiffs maintain that they have already reduced their fees to adequately reflect their lack of success on some of the claims.  *Id.* at 17.  Finally, they defend their hourly rates and expenses.  *Id.* at 17–19.

### D.    The Plaintiffs' *DeSena v. LePage* Memorandum

The Plaintiffs say that the decision of the three-judge panel in *DeSena* is "instructive in several respects."  *Pls.' DeSena Br.* at 1.  First, they say *DeSena* "reaffirms that prevailing parties in civil rights litigation are entitled to compensation for the time their attorneys reasonably spent in achieving the favorable outcome, even if the plaintiff failed to prevail on every contention."  *Id.* (internal punctuation and citation omitted).  Second, they observe that *DeSena* approves the pairing of national specialists with skilled local practitioners.  *Id.* at 2. Third, they point out that the *DeSena* panel rejected the State's attempt to slash the attorney's fee request.  *Id.*  At the same time, they distinguish the *DeSena* case as much simpler than the case presented here.  *Id.* at 2–5.  Furthermore, they say that the *DeSena* panel rejected the State's position that because the State used only two lawyers, the Plaintiffs should be similarly limited.  *Id.* at 5–7.  The Plaintiffs concede, however, that under *DeSena* the four hours they spent in media communication should be deducted.  *Id.* at 7.  They note that the *DeSena* panel

rejected the State's claim that all associate time should be excluded. *Id.* They contend that *DeSena* buttresses their claim that the fee award should not be limited to Maine rates. *Id.* at 7–8. Finally, they argue that *DeSena* "confirms that the Court should not reduce rates for 'non-core' tasks, with the possible exception of travel time during which no work on the case was performed (for which either rates or hours, but not both, may be reduced by up to one-half), and for work pertaining to fee recovery (for which plaintiffs will file a supplemental fee motion shortly)." *Id.* at 10.

### E.    The State's *DeSena* Brief

The State contends that the *DeSena* decision "strongly supports the Attorney General's opposition to plaintiffs' Fee Motion in at least five areas." *Def.'s DeSena Br.* at 2. First, the State quotes *DeSena* as limiting out-of-state rates to cases where "the complexities of a particular case *require* the particular expertise of non-local counsel," *id.* (quoting *DeSena*, 847 F. Supp. 2d at 214), and argues that, if the Court determines that out-of-state counsel was required, the Court should follow the *DeSena* panel in applying the *Laffey* Matrix to determine the proper hourly rates. *Id.* Second, the State contends that *DeSena* teaches that associates are "not entitled to be paid at higher rates unless plaintiffs show that those associates [ ] have particular expertise that is not readily available in the local market." *Id.* at 2–3. Third, the State maintains that the approved hourly rate of local counsel in *DeSena* of $295 establishes the proper rate for comparable attorneys. *Id.* at 3. Fourth, the State says that *DeSena* requires the Court to eliminate "duplicative,

14

unproductive, or excessive hours." *Id.* at 3 (quoting *DeSena*, 847 F. Supp. 2d at 210). Fifth, the State contends that, based on *DeSena*, "the appropriate rate in 2011 for paralegal work" is $95 to $100. *Id.* The State disputes the Plaintiffs' contention that *DeSena* confirmed that the Court should not reduce a bill for non-core tasks; rather, the State says that the *DeSena* panel merely stated that, other than travel time, it could not identify any "non-core work that warranted a reduction." *Id.* at 5 (quoting *DeSena*, 847 F. Supp. 2d at 213).

### F. The Plaintiffs' Reply

The Plaintiffs object to the State attempting to "set the bar so high for justifying the use of out-of-forum hourly rates . . . that no plaintiff could ever satisfy it." *Pls.' DeSena Reply* at 1. Second, the Plaintiffs urge the Court not to apply the *Laffey* Matrix, maintaining that the *DeSena* panel's use of the index was necessitated by the absence of expert testimony and other objective evidence establishing the reasonableness of the hourly rates. *Id.* at 2. Third, the Plaintiffs reiterate their request for out-of-forum hourly rates for associates and for paralegals. *Id.* at 3–5. Fourth, they defend the hourly rates of their local counsel. *Id.* at 4–5. Finally, they argue that the amount of time they spent on the case was reasonable. *Id.* at 5.

### G. The Plaintiffs' Supplemental Request

In their July 20, 2012, motion, the Plaintiffs request an additional award of $117,310.01 for time and expenses incurred after June 30, 2011, for pursuing their motion for award of fees. *Pls.' Supplemental Mot.* at 1–7.

### H.     The State's Response

In response, the State opposes any award of fees for the Plaintiffs' pursuit of fees but to the extent the Court grants such a supplemental award, the State urges the Court to reduce the hourly rate to no more than $150 and greatly reduce the number of hours sought.  *Def.'s Supplemental Opp'n* at 1–7.

### I.     The Plaintiffs' Reply

In reply, the Plaintiffs reiterate their request to be compensated for work they have performed in pursuing this motion.  *Pls.' Reply* at 1–8.

## IV.   DISCUSSION

### A.     Section 1988: An Overview

"In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser."  *Boston's Children First v. City of Boston*, 395 F.3d 10, 13–14 (1st Cir. 2005) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975)).   "Congress, however, has created exceptions to this 'American Rule,' permitting fee-shifting in some contexts to encourage meritorious litigation that benefits the plaintiff and the public interest."  *Id.* at 14.   One exception to the American Rule is found at 42 U.S.C. § 1988, which provides in part: "In any action or proceeding to enforce a provision of [42 U.S.C. § 1983], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ."  42 U.S.C. § 1988(b).

16

"Section 1988 requires a two-part inquiry: (1) whether the plaintiff is a prevailing party, and (2) if the plaintiff is a prevailing party, what constitutes a reasonable fee award." *Boston's Children First*, 395 F.3d at 14. The First Circuit has observed that "[a]lthough this fee-shifting provision is couched in permissive terminology, awards in favor of prevailing civil rights plaintiffs are virtually obligatory." *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 293 (1st Cir. 2001).

### 1.    "Prevailing Party"

To be awarded an attorney's fee under § 1988, the requesting party must have prevailed in the underlying litigation; however, the statute does not mandate total victory. To achieve prevailing party status, a plaintiff must "show that he succeeded on an important issue in the case, thereby gaining at least some of the benefit he sought in bringing suit." *Gay Officers Action League*, 247 F.3d at 293. "Put another way, 'a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'" *Id.* (quoting *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992)). Here, although the State does not expressly concede it, there is no doubt but that the Plaintiffs prevailed in this lawsuit. At the outset, the Plaintiffs sought to have certain provisions of 22 M.R.S. § 1711-E declared to be in violation of the First and Fourteen Amendments of the United States Constitution. In the end, this is what they achieved. *Compare Compl.* (ECF No. 1) *with Final J.* (ECF No. 117).

## 2.     Reasonable Fee

The First Circuit recently described the process by which federal district courts ordinarily determine reasonable fee awards:

> When fashioning a fee award, the district court ordinarily starts by constructing what has come to be known as the lodestar.  In general, the lodestar is the product of the number of hours appropriately worked times a reasonable hourly rate or rates.  The party seeking the award has the burden of producing materials that support the request.  These materials should include counsel's contemporaneous time and billing records, suitably detailed, and information anent the law firm's standard billing rates.  The putative payor may submit countervailing evidence.

*Hutchinson v. Patrick*, 636 F.3d 1, 13 (1st Cir. 2011) (internal citations omitted). "In implementing this lodestar approach, the judge calculates the time counsel spent on the case, subtracts duplicative, unproductive, or excessive hours, and then applies prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved)."  *Gay Officers Action League*, 247 F.3d at 295.

## 3.     Recent Decisions

The Court looks in particular to two recent decisions for instruction on many of the specific issues raised by the Plaintiffs' Motion.

### a.     The *DeSena* Panel's Decision

On March 21, 2012, a three-judge panel of the United States District Court in Maine issued a significant decision that addressed the reasonableness of attorney's fees under § 1988.  *See DeSena*, 847 F. Supp. 2d at 207.  The decision is instructive[6]

---

[6]     The Plaintiffs correctly note that *DeSena* is not binding on this Court.  *Pls.' DeSena Br.* at 1; *see In re Sealed Case*, 838 F.2d 476, 491 n.24 (D.C. Cir. 1988); *San Diego Unified Port Dist. v.*

in that it represents the considered views of three judges within this District and Circuit on issues similar to those now before this Court.

After reviewing the proper analytic approach to attorney's fee issues, the *DeSena* panel addressed (1) work on matters that bore no relation to the grant of relief; (2) reasonable hourly rates for local counsel in the District of Maine; (3) reasonable hourly rates for out-of-district counsel; (4) reasonable hourly rates for out-of-district associates; (5) reasonable hourly rates for paralegals; (6) the reasonableness of the number of hours billed; (7) time spent dealing with the media; (8) travel time; (9) paralegal work; and (10) time spent preparing a fees motion.

Regarding work on unsuccessful matters, the *DeSena* panel noted the United States Supreme Court's recent guidance that the fee award "should not reimburse the plaintiff for work performed on claims that bore no relation to the grant of relief." *Id.* at 209 (quoting *Fox v. Vice*, 131 S. Ct. 2205, 2214 (2011)).

Regarding the hourly rate for local counsel, the *DeSena* panel approved a rate of $295 during the year 2011 for a Maine lawyer with 35 years of experience as a member of the bar of the District of Maine.  *Id.* at 211–12 and n.4 (also noting that this hourly rate is "at the high end of recently approved rates").  Regarding the hourly rate for Washington, D.C.-based counsel, the *DeSena* panel made two rulings: (1) before a court will approve higher out-of-district rates, counsel must establish that they possess a "particular expertise that is not readily available in the local market;" *id.* at 215–16, and (2) the maximum hourly rate a Washington,

---

*Gianturco*, 651 F.2d 1306, 1315 n.24 (9th Cir. 1981); *Farley v. Farley*, 481 F.2d 1009, 1012 (3d Cir. 1973) ("The decision of a three-judge court is entitled to no more weight than any other district court decision").

D.C.-based reapportionment specialist may reasonably charge under the so-called *Laffey* Matrix is $475. *Id.* at 214–15. Regarding the hourly rates for Washington, D.C.-based associates, the *DeSena* panel concluded that there was no evidence the work performed by the associates could not have been completed by comparably credentialed Maine-based associates, and reduced their hourly rates to "the local rate for a comparably credentialed associate in Maine," which the panel found to be $175 for work on the merits of the case ($147.50 for work on the fee request). *Id.* at 215–16. Regarding the hourly rates for paralegals, the *DeSena* panel accepted the rate of $95.00. *Id.* at 213–14. Regarding the amount of time spent, the *DeSena* panel carefully reviewed the billing records; after reducing some specific items for the Washington-D.C.-based partner, it awarded substantially all his time, *id.* at 215, but reduced the associates' hours by one-half. *Id.* at 216.

Regarding non-core work, the *DeSena* panel declined to order any reimbursement for attorney time spent talking to the media. *Id.* at 212. The *DeSena* panel also adopted the "common past practice" for an attorney to recover his travel time at half of the approved rate. *Id.* at 212–13. In addition, the *DeSena* panel reduced the amount counsel billed to prepare and present the fee motion itself by one-half. *Id.* at 213. Finally, the *DeSena* panel approved the application for case-related paralegal work. *Id.* at 213–14.

### b.    The *Sorrell* Attorneys' Fees Decision

For additional guidance, the Court has reviewed the July 17, 2012, decision by United States District Judge Garvan Murtha in the Vermont companion case.

*See Sorrell*, 2012 U.S. Dist. LEXIS 99105.   In *Sorrell*, the same Plaintiffs represented by the same out-of-district counsel filed suit to block the enforcement of a similar law on the same grounds raised in the lawsuit in the District of Maine. The major difference is that, unlike this case, *Sorrell* was fully briefed and argued in the United States Supreme Court.

In *Sorrell*, the Plaintiffs demanded $3,923,275.00 in attorneys' fees, $177,269.81 in expenses, and $104,522.48 in costs for a total award of $4,205,067.26.  *Id.* at *3.  Judge Murtha awarded $2,137,050 in attorneys' fees and $106,989.63 in expenses; he declined to issue an order on costs and referred that issue to the Clerk of Court.  *Id.* at *28–29.

In reaching this conclusion, Judge Murtha made a number of significant findings.  First, he concluded that the Plaintiffs had overcome a Second Circuit presumption in favor of local counsel because "a reasonable paying client would have continued using the same counsel that had just secured them a victory in a very similar case," namely the New Hampshire case.  *Id.* at *9.  Second, the Court concluded that the average billing rate of $377.90 was unreasonable and specifically concluded that Attorney Julin's average hourly rate of $670.66, associate hourly rates of over $400, and paralegal rates of nearly $200 were exorbitant.  *Id.* at *12–13.  Judge Murtha fixed the average hourly rate at $300—"a rate between the out-of-district rates requested and the rates charged by local attorneys."  *Id.* at *13–14. Third, noting that the same counsel had just litigated to decision a similar case in New Hampshire, Judge Murtha wrote that he would have expected to see "greater

realization of efficiencies." *Id.* at *15.  Fourth, he noted that the "convention" in the District of Vermont "is to reduce by half time spent solely on travel." *Id.* at *16.

With these findings, he reduced the claimed hours by 30%.  *Id.* at *17.  He refused to approve out-of-district rates for the preparation and presentation of the attorneys' fee motion, concluding that "Plaintiffs' Vermont counsel are more than capable of handling a fee matter."  *Id.* at *20.  He set $300 as the "reasonable Vermont rate" for an experienced partner and $200 for an experienced senior associate.  *Id.* at *20–21.

Regarding the claimed expenses, Judge Murtha declined to award expenses for meals, noting that "attorneys must eat whether litigating this case or not," *id.* at *24–25; for publications, noting that "the majority of the expense was the purchase of books and articles," *id.* at *25; for trial exhibits, *id.*; for rental of a copier for trial, *id.* at *26; for half of claimed courier expenses, *id.*; for half of claimed legislative research and transcription expenses, *id.* at *26–27; and for half of claimed travel-related expenses.  *Id.* at *27–28.

## B.    Calculating the Lodestar

To calculate the lodestar, the Court must determine the number of hours appropriately worked, determine reasonable hourly rates, and multiply the two figures together.  In performing this calculation, the Court has considered a number of different factors, each discussed below.  However, the Court follows Judge Murtha in declining to fix hours and hourly rates on a case by case basis for the more than thirty individual timekeepers, given the volume and nature of the billing

records.  *See Sorrell*, 2012 U.S. Dist. LEXIS 99105 at *13 n.4 and *17–18.  Although the Court has examined the bill in some detail—yielding some specific observations set forth below—the Court has taken an "across-the-board" approach in arriving at a final figure.  *See id.*

### 1.   Excessive Fees

As an initial matter, the Court addresses the State's contention that the Court should deny the fee application in its entirety, not because the Plaintiffs did not prevail, but because they, in the State's view, have submitted a fee application so grossly high that the Court should refuse to approve any of it.  *Def.'s Opp'n* at 9–10.

"[U]nless special circumstances would render such an award unjust," the general rule is that the prevailing party is entitled to an award of attorneys' fees. *Lewis v. Kendrick*, 944 F.2d 949, 957 (1st Cir. 1991) (quoting *Blanchard v. Bergeron*, 489 U.S. 87, 89 n.1 (1989)).  "The 'special circumstances' warranting the complete denial of attorneys' fees 'are narrowly circumscribed.'"  *Cushing v. McKee*, No. 1:10-cv-330-GZS, 2012 U.S. Dist. LEXIS 46591, *14 (D. Me. Apr. 3, 2012) (quoting *De Jesus Nazario v. Rodriguez*, 554 F.3d 196, 200 (1st Cir. 2009)).  "[T]he burden is on the defendant to show that unusual conditions would make an award unjust or inappropriate."  *De Jesus Nazario*, 554 F.3d at 200 (quoting *United States v. Cofield*, 215 F.3d 164, 170 (1st Cir. 2000)).

This case does not satisfy the "stringent criteria for special circumstances." *See Cushing*, 2012 U.S. Dist. LEXIS 46591 at *15.  In *Cushing*, Judge Singal

observes that such "special circumstances" are generally restricted to outrageous, inexcusable, bad faith, or obdurate conduct by the plaintiff or his counsel.  *See id.* (citing cases).  One such outrageous act may be to submit a request for attorney's fees so "gluttonously high" that the court is justified in denying the fee request altogether.  *See Spooner v. EEN, Inc.*, 644 F.3d 62, 69 (1st Cir. 2011).  However, the First Circuit has cautioned that an outright denial of fees due to "an overly ambitious fee request is a drastic step" and such "powerful medicine [is] to be administered sparingly and in only the most egregious cases."  *Id.*

Here, the Plaintiffs have not been shy in requesting over $1,300,000 in attorney's fees, but in the Court's view, the total request is not so excessive as to amount to bad faith meriting outright denial rather than reduction.  This is especially true as the District Court in Vermont awarded total fees in excess of $2,000,000 in a companion case.  *Sorrell*, 2012 U.S. Dist. LEXIS 99105 at *29 (awarding $2,137,050 in fees and $106,989.63 in expenses).

## 2. Number of Hours Appropriately Worked

The Plaintiffs claim a total of 2740.35 hours.  In evaluating the Plaintiffs' claim, the Court has taken into consideration each of the factors discussed below, and has looked in particular for hours that were "duplicative, unproductive, or excessive." *see Gay Officers Action League*, 247 F.3d at 295.

### a. Claims Upon Which No Relief Was Granted

The Plaintiffs' Complaint contained four counts: Count I—the First Amendment Commercial Speech Count; Count II—a First Amendment Non-

Commercial Speech Count; Count III—a vagueness and overbreadth Count; and Count IV—a Commerce Clause Count. *Compl.* at 22–31.[7] The Plaintiffs obtained a favorable Judgment on Count I; Counts II, III, and IV were dismissed. *Order on Remand* at 1–2 (ECF No. 116). The State asks the Court to exclude the time spent on failed claims. *Def.'s Opp'n* at 28–30. The State concedes that at the trial level, "it is difficult to carve out such time, and the State has not sought to do so." *Id.* at 30. However, the State observes that 10½ pages of the Plaintiffs' 11-page argument in their cert petition and reply "were devoted exclusively to the dormant Commerce Clause" and the State estimates that 60% of the Plaintiffs' First Circuit brief and argument was devoted to the dormant Commerce Clause argument and should be excluded. *Id.*

The Plaintiffs reply that, "although not necessarily required to do so, [they] voluntarily reduced the fees sought by over $100,000 to exclude time spent on issues upon which the Court was not required to rule, including the Commerce Clause claim." *Pls.' Reply* at 12. They point out that "[o]n remand, plaintiffs voluntarily dismissed all but count I of the complaint (commercial speech), because they obtained all of the relief that they sought through that claim." *Id.* They maintain that their "success was not 'partial,' and no judgment was entered against them on the remaining counts, as in cases cited by the state." *Id.*

On this point, the State has the better argument. As the Supreme Court has written, the legal standard for fee-shifting is narrow: "The fee award, of course,

---

[7]   The pagination in the Plaintiffs' Complaint differs from the pagination in the ECF filing; the Court uses the ECF pagination.

should not reimburse the plaintiff for work performed on claims that bore no relation to the grant of relief: Such work cannot be deemed to have been expended in pursuit of the ultimate result achieved." *Fox*, 131 S. Ct. at 2214. The Plaintiffs' argument that the State did not obtain a judgment in its favor on the three dismissed counts misplaces the burden. It is the Plaintiffs' obligation to demonstrate that their work led to the grant of relief, not the State's burden to demonstrate that it obtained a judgment in its favor. Here, the Plaintiffs cannot justifiably claim that they obtained relief based on the work they did on Counts II, III, and IV of their Complaint. Those counts were dismissed and "bore no relation to the grant of relief," *see Fox*, 131 S. Ct. at 2214, and as a result, work spent on Counts II–IV should be excluded from the fee award. *See Burke v. McDonald*, 572 F.3d 51, 65 (1st Cir. 2009) (affirming a district court reduction of nearly sixty percent of the overall fee for work on unsuccessful claims); *see also Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) ("The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim"). The Court therefore has an obligation to examine the bill and the work performed to make certain that the state of Maine is not being asked to reimburse the Plaintiffs for work on unsuccessful claims.

Carving out the time the Plaintiffs spent on the Commerce Clause and overbreadth/void-for-vagueness arguments—as opposed to the commercial speech First Amendment issue—is not easy. The State concedes it cannot be done at the

trial level but points out that the Plaintiffs devoted roughly 60% of their First Circuit brief and argument to the Commerce Clause and overbreadth/void for vagueness claims and virtually their entire petition for writ of certiorari to the Commerce Clause claim. *Def.'s Opp'n* at 30.

### i.      The First Circuit Appeal

The State is correct that most of the Plaintiffs' efforts on appeal to the First Circuit were directed to the Commerce Clause and overbreadth/vagueness issues. In the peculiar context of the appeal, the Plaintiffs had no real choice. This Court issued its decision granting the preliminary injunction on First Amendment grounds on December 21, 2007. The State filed an interlocutory appeal on February 25, 2008. On November 18, 2008, the First Circuit overturned the First Amendment analysis of Judge Barbadoro in the *Ayotte* case and determined that the New Hampshire law passed First Amendment scrutiny. Thus, when the Plaintiffs filed their briefs in the fall of 2009 on the appeal to the First Circuit, the appellate court had already ruled against a similar First Amendment argument. Furthermore, the Second Circuit had not yet issued *Sorrell*, which decided the First Amendment issue in the Vermont case in favor of the Plaintiffs. Realistically, under these circumstances, the Plaintiffs seem wise to have emphasized the Commerce Clause and overbreadth/void-for-vagueness issues, which the First Circuit had not decided against them, over the First Amendment issue, which the First Circuit had all but rejected.

The wisdom of emphasizing on appeal issues upon which the Plaintiffs did not prevail is not, however, the test for determining whether they are entitled to reimbursement under § 1988. Rather, it is whether they actually prevailed on those issues. They did not.

The Plaintiffs claim fees for 499 hours on the First Circuit appeal. *See Bill* at 182. Allocating a portion of that time to unsuccessful issues is not simple, and in any event, the Court could not arrive at an exact number by combing through the billing entries, some of which are themselves inexact in describing the legal work or the percentage of time spent on individual tasks. Instead, the Court uses the number of pages in the substantive portion of the Plaintiffs' Brief as a rough proxy for the amount of time the Plaintiffs spent on each issue. The substantive part of their Brief ran from page 42 through page 74; the ultimately successful First Amendment argument is found in pages 62 through 71. *See* Appellees' Brief, *IMS Health Inc. v. Mills*, No. 08-1248, 2008 U.S. 1st Cir. Briefs 188984, *42–74. The First Amendment argument therefore accounted for ten of thirty-three pages, roughly 30%. The Court therefore concludes that the Plaintiffs are entitled to reimbursement for approximately 30% of their appellate time at the First Circuit. The 30% award also roughly coincides with the fact the Plaintiffs were ultimately successful on one out of the three issues on appeal.

Not all of the hours related to the First Circuit appeal merit reduction. For example, after the State appealed, the parties engaged in a series of discussions about whether to stay the appeal pending the resolution of *Ayotte*. Those

discussions should not be subjected to a reduction because they related to general strategy.

At the same time, were the Court to scrutinize the bill, it would exclude some entries outright as unnecessary.  For instance, Attorney Isani's .2 hour initial review of an attempted interlocutory appeal by a pro se filer named Jonathan Lee Riches should have ended Hunton & Williams's involvement in that matter, yet it spent more than an hour of additional time on it.  Mr. Riches, who had nothing whatsoever to do with this case, filed a motion to intervene on July 10, 2008.  On July 15, 2008, the Court acted promptly, not only denying his motion but also issuing an Order enjoining him from filing.  On July 24, 2008, Mr. Riches filed an Interlocutory Appeal of this Order, and on November 17, 2008, the First Circuit dismissed his appeal.  All of this was decidedly an odd sideshow, and it was clear from the outset that Mr. Riches' involvement was frivolous.

Finally, the Court acknowledges that the Plaintiffs voluntarily deleted some billing entries relating to the First Circuit appeal, and has taken this into account in determining a total number of hours appropriately worked.

### ii.      The Petition for Writ of Certiorari

The Plaintiffs spent a total of 118.85 hours pursuing their case at the Supreme Court.  *See Bill* at 182.  After reviewing the Plaintiffs' petition for writ of certiorari, the Court agrees with the State that the Plaintiffs devoted nearly the entire petition and reply to their Commerce Clause argument and mentioned the First Amendment only as an aside.  *See Def.'s Opp'n* Attach. 12, *Pls.' Pet. for a Writ*

of *Certiorari* at 16–27[8]; Attach. 14, *Pls.' Reply Brief in Support of their Pet. for Writ of Certiorari* at 3–11.   The Court acknowledges that the Plaintiffs voluntarily deleted some billing entries relating to the petition for writ of certiorari, and has taken this into account in determining a total number of hours appropriately worked.

### b.    Inefficiencies

In ruling on the fees motion in *Sorrell*, Judge Murtha observed that, since similar litigation was proceeding in three Districts, he would have expected to see "greater realization of efficiencies."  *Sorrell*, 2012 U.S. Dist. LEXIS 99105, *15.  The state of Maine also asserted that some of the time that the Plaintiffs are charging in this case duplicates time they spent in *Ayotte*, the New Hampshire case.  *Def.'s Opp'n* at 13.  The State complains that the Plaintiffs charged 65 hours to draft the Complaint in this case, which it claims is "largely a cut-and-paste of the *Ayotte* complaint."  *Id.*  The State maintains that a proficient attorney could have prepared the Maine Complaint in 10, not 65 hours.  *Id.*  The Plaintiffs respond that the New Hampshire and Maine laws were not identical and they had to tailor their Maine allegations to the Maine law.  *Pls.' Reply* at 10–11. The State is also critical of the Plaintiffs' billing for extensive preparation of witnesses that they had already used in the New Hampshire litigation.  *Def.'s Opp'n* at 12–16.

Here, the Court takes a middle path.  To begin, it is notable that unlike in the Vermont litigation, where the District Court ordered over $2,000,000 in attorneys'

---

[8]    The pagination in the Plaintiffs' attachment differs from the pagination in the ECF filing; the Court uses the ECF pagination.

fees, the parties in the New Hampshire litigation agreed to be responsible for their own fees. As the Plaintiffs have an undeniable incentive to bill the Maine side of the case, which is subject to reimbursement, as opposed to the New Hampshire side, which is not, the Court has scrutinized charges for time in Maine that mimic charges for time in New Hampshire. There can be no precision in this assessment; however, the Court agrees with the State that 65 hours to redraft the New Hampshire Complaint, 114.7 hours to re-interview many of the experts who appeared in the New Hampshire litigation, and 169 hours to rephrase the New Hampshire motion for preliminary injunction are excessive, and the Court has taken these duplicative charges into account in arriving at its final figure.

### c.    Overstaffing

The State also objects to what they contend is overstaffing. The State asks the Court to restrict reimbursement to only four lawyers—Attorneys Julin, Ash, Montgomery, and Goldstein—and to eliminate all time billed by associates, paralegals, and litigation support personnel. *Def.'s Opp'n* at 10. The First Circuit has recognized both sides of this argument, noting that awards under the Fees Act are not "to serve as full employment or continuing education programs for lawyers and paralegals," but cautioning that, "[g]iven the complexity of modern litigation, the deployment of multiple attorneys is sometimes an eminently reasonable tactic." *Gay Officers Action League*, 247 F.3d at 297. Thus, the "mere fact that more than one lawyer toils on the same general task does not necessarily constitute excessive staffing." *Id.*

31

The Court rejects the State's main point: that the Plaintiffs used a small army of lawyers when only a scouting party would have done. The legal issues in this case were extremely complex and ultimately were resolved by an opinion of the United States Supreme Court. In short, this was no run-of-mill case and the Plaintiffs knew that they had to present their very best case, not only because the legal issues were difficult and sophisticated but also because failure could have threatened their very existence.

However, within the voluminous billing records some examples of overstaffing do appear. It appears from the billing records that three lawyers billed for their attendance at the First Circuit oral argument in this case: Thomas C. Goldstein of Akin Gump (later Goldstein & Russell), who is listed in the First Circuit's opinion as primary counsel, Ira J. Lidsky, then an associate at Akin Gump and not listed in the opinion, and John Montgomery. *See Mills*, 616 F.3d at 12. Attorney Goldstein billed 5.4 hours on April 5, 2010 for "final prep, oral argument, and follow-up"; Attorney Lidsky billed 7.5 hours on April 5, 2010 for "prepare for and attend First Circuit oral argument"; and Attorney Montgomery billed 4.10 hours on April 5, 2010 for "prepare for and attend First Circuit oral argument."[9] Although the Plaintiffs may be willing to pay for lawyers to watch an oral argument, there is no reason the taxpayers of the state of Maine should.

### d.   Travel Time

---

[9]      The Court acknowledges that Bernstein Shur deleted the three hours that Attorney John M.R. Paterson spent to attend the oral argument in the First Circuit.

In *Hutchinson v. Patrick*, 636 F.3d 1 (1st Cir. 2011), the First Circuit observed that "[t]ravel is often a necessary incident of litigation" and "may be reimbursed in a fee award." *Id.* at 29. Yet the First Circuit acknowledged that "such time ordinarily is calculated at an hourly rate lower than that which applies to the attorney's substantive labors." *Id.* Both the *DeSena* and *Sorrell* Courts concluded that travel time should be reimbursed at a half-rate, and the Court adopts the same principle here in arriving at a total award.

The Plaintiffs maintain that they worked while they traveled but contend that for those entries that do not reflect that they were working while traveling, the Court "should not reduce the fee by more than one-half." *Pls.' Reply* at 19.[10] The Court has done its best to review the bill and has confirmed that, although some entries indicate the attorneys worked while they traveled, numerous entries of travel time for nearly every traveling attorney are not accompanied by any reference to work being performed during the travel.[11] Furthermore, occasionally

_____

[10]    On this issue, the Plaintiffs seem to forget that it is their burden, not the Court's, to prove the reasonableness of their fees. The Plaintiffs submitted a bill consisting of 181 pages of minute itemization. Within this voluminous bill, the Plaintiffs' travel time is never separated out; rather than direct the Court to those instances where they traveled and worked, and where they traveled and did not work, the Plaintiffs simply made a blanket assertion that they are entitled to be paid in full for work during travel and then concede "[f]or the few entries that do not reflect that counsel were working on the case, the Court should not reduce the fee by more than one-half." *Pls.' Reply* at 19.

    They effectively charged the Court with the duty to scour their bill to find charges for travel, to determine whether work was billed with the travel, to calculate the half-rate amount of pure travel time, to make appropriate deductions so that their bill may be reimbursed. Making it so arduous for the Court to reduce the bill for charges they acknowledge should be deducted may be "precisely what was intended." *Sullivan*, 625 F. Supp. 2d at 44 n.15.

[11]    *See* Mark A. Ash 10/31/2007: Travel from Raleigh to Philadelphia 3.00 x $337.50 = $1,012.50; Mark A. Ash 11/21/2007: Travel from Bangor to Raleigh 7.00 x $337.50 = $2,362.50; Jamie Z. Isani 11/17/2007: Travel from Miami to Bangor for preliminary injunction hearing: 6.00 x $380 = $2,280.00; Jamie Z. Isani 11/21/2007: Travel from Bangor, Maine to Miami, Florida following preliminary injunction hearing 7.00 x $380 = $2,660.00; Thomas J. Julin 9/5/2007: Travel from Boston to Portland, Maine for meeting with Jack Montgomery 2.00 x $650 = $1,300.00; Thomas J.

the attorneys do not separate out travel time from work.[12]  In the future, attorneys should be aware that the standard practice in the District of Maine is to pay travel time at one-half the approved rate.  If attorneys fail to separate out travel as opposed to work time, they run the risk of having the entire entry paid at a half-rate.

Finally, even in those circumstances where the attorney says he was working while traveling, it is unrealistic to claim that every moment of travel is substantive work.  On November 17, 2007, Mr. Julin spent 7.2 hours and Mr. Ash 8.0 hours traveling to Bangor; both attorneys say that they were working as they traveled.  Although the Court is willing to accept their representations that they spent the vast bulk of it working, their bills seem to claim they were working while driving to the airport, checking in, passing through security, getting to the gate, and enduring the other time-consuming rigors of modern air travel.

### e.    Dealing with the Press

In *DeSena*, the panel declined to order reimbursement for time that an attorney spent dealing with the press.  *DeSena*, 847 F. Supp. 2d at 212.  The state of

---

Julin 11/2/2007: Travel from Plymouth Meeting to Philadelphia Airport: 1.00 x $650.00 = $650.00; Thomas J. Julin 11/21/2007: Return to Miami from Bangor Maine: 6.5 x $650 = $4,225.00.

[12]    *See* John H. Montgomery 9/6/2007: Travel to Augusta; conference with Attorney General; conferences with Attorney Julin: 7.40 x $375.00 = $2,775.00.  As the trip from Portland to Augusta and back typically takes between 2.5 to 3 hours, the Court does not know if he is truly claiming that he worked as he traveled.  Similarly, *see* John H. Montgomery 11/17/07: Travel from Freeport to Bangor; conference with co-counsel, etc.: 7.8 x $375.00 = $2,925.00 and 11/21/2007 John H. Montgomery: Travel to Portland; follow-up calls and email to witnesses and client: 6.7 x $375.00 = $2,512.50.  As Mr. Montgomery was in Bangor on November 20, 2007, to attend the hearing, which concluded after 5 p.m., the Court assumes Mr. Montgomery traveled from Bangor to Portland the next day, but that trip typically takes at most 2.5 hours.  Mr. Ash spent three hours traveling from Raleigh to Philadelphia on October 31, 2007 and returned on November 2, 2007.  The October 31, 2007 billing was for travel alone, but the November 2, 2007 billing was for 5.5 hours for travel and work.  From these examples, the Court cannot know whether the attorney is justifiably billing a full rate for working while traveling or would, if pressed, segregate out the time just traveling.

Maine objects to certain items that it contends reflect attorney time that should be excluded under this guidance. Specifically, the State objects to 3.25 hours that Mr. Ash billed on August 27, 2007 and to an unspecified number of hours that Attorneys Julin and Montgomery billed on August 27–29, 2007, October 2, 2007, December 14 and 23, 2007, and June 28, 2008. *Def.'s DeSena Br.* at 22. In their *DeSena* brief, the Plaintiffs concede that four hours of such time should be deducted.[13] *Pls.' DeSena Br.* at 7.

### f.      Conceded Reductions

The State points out that Mr. Julin's bill contained what appears to be a duplication by clerical error for work performed on April 1, 2010. *Def.'s Opp'n* at 22. In their reply, the Plaintiffs concede that "[t]he state has correctly noted one clerical error—that an April 1, 2007 (sic) time entry for Mr. Julin was duplicated. The property entry, for 5.7 hours, should be allowed." *Pls.' Reply* at 16. The bill has two entries on April 1, 2010, for the same described work: one for 5.7 hours and the other for 6.2 hours.

Although not raised by the parties, while searching for the April 1, 2010, entry, the Court came upon two entries on April 2, 2010, containing exactly the same time with exactly the same description on the same day: "Further research requested by Tom Goldstein concerning First Circuit panel decisions in First

---

[13]     The Court could not scrub each itemized entry in the Plaintiffs' voluminous bill but in studying the bill for purposes of this ruling, it did happen upon other entries that seem to fall under media relations but were not deducted. On December 20, 2007, Mr. Julin spent .3 hours at $650.00 for a total charge of $195.00 to "[r]eview recent press reports about the case published in Maine." On December 26, 2007, Ms. Milberg spent .5 hours at $245.00 for a charge of $122.50 for "[r]eview and analyze press coverage of order . . . in preparation for consideration of strategy and next steps in litigation." On October 8, 2010, Mr. Julin billed .5 hours at $710.00 for a charge of $355.00 for "correspondence with Harvey Ashman concerning LA Times article."

Amendment and pharmaceutical areas and outlining of those decisions (3.5); participation in second moot court session (1.5)." On September 4, 2012, the Court emailed counsel to determine whether these entries were duplicates and by email to the Court dated September 4, 2012, Mr. Julin confirmed that the second entry on April 2, 2010, was in error. The Court has taken these errors into account in determining a reasonable fee award.

### g.    Conclusion:  Number of Hours

Taking into account each of these factors, the Court, in an exercise of discretion, concludes that the Plaintiffs' 2740.35 hours must be reduced by approximately 27%, to 2000. *See Sorrell*, 2012 U.S. Dist. LEXIS 99105 at *17 (reducing 9782 claimed hours by approximately 30% to 6850).

### 3.    Reasonable Hourly Rates

Step two in calculating the lodestar is to determine reasonable hourly rates. The Plaintiffs have claimed an average hourly rate of $414, with individual rates ranging from $65 for litigation support staff to $925 for Attorney Thomas C. Goldstein.

### a.    Local Counsel Hourly Rates

Local counsel for the Plaintiffs was John H. Montgomery, a shareholder in the Portland, Maine, law firm of Bernstein, Shur, Sawyer & Nelson. Mr. Montgomery began representing the Plaintiffs in July 2007, and had practiced law for 30 years at the commencement. From 2007 through 2009, his hourly rate was $375; from January 2010 to January 2011, it rose to $380; and, from January 2011

onward, it was $385.  Joining Mr. Montgomery as a Bernstein Shur partner was John M.R. Paterson, who consistently billed at $370 per hour throughout his involvement, which ended in November 2007.

The Plaintiffs contend that other respected Maine lawyers charge even higher hourly rates, making Mr. Montgomery's and Mr. Paterson's rates seem modest.  *See Pls.' Mot.* Attach. 12, *Decl. of Peter Murray*, at 3[14] (stating that "first-line trial lawyers who regularly practice in the state and federal courts in Portland and Bangor, Maine range from $300–450 per hour depending on skill, reputation and experience"); Attach. 13, *Tr. of Initial Tel. Conf. Conference Held on Apr. 22, 2011*, 55:2–6 (Portland, Maine, Attorney William Kayatta, acting as Special Master by appointment of the Supreme Court in the case of State of Kansas v. State of Nebraska and State of Colorado, stating that his normal hourly rate is $575, although there are some matters he does for $550, and that he intended to bill an hourly rate of $490 in that case).  However, the First Circuit has rejected a purely "market-based standard," noting that in the fee-shifting context, the normal business constraints are skewed because the firm's client does not pay the shifted fee.  *See United States v. Metropolitan Dist. Comm'n*, 847 F.2d 12, 17 (1st Cir. 1988).

The Court finds that Mr. Montgomery's and Mr. Paterson's claimed hourly rates are excessive and concludes that a reasonable hourly rate for experienced Maine-based counsel is around $300.  In doing so, the Court has taken into account the $295 hourly rate the *DeSena* panel approved and described as "at the high end

---

[14]    Again, the pagination differs between the original document and the ECF filing.  The Court uses the ECF pagination.

of recently approved rates." *DeSena*, 847 F. Supp. 2d at 212 n.4.   It has also considered this Court's award in *Sullivan v. City of Augusta*, 625 F. Supp. 2d 29 (D. Me. 2009), in which it approved a $300 hourly rate for Maine-based First Amendment counsel.   *Id.* at 43.

### b.   Out-of-District Partner Hourly Rates

The Court readily agrees with Judge Murtha that, in view of the specialized nature of the industry and the law, and given the efficiencies of hiring counsel who had already tried one federal court case on the same subject, the Plaintiffs' decision to hire out-of-district counsel was eminently reasonable.   *See Sorrell*, 2012 U.S. Dist. LEXIS 99105 at *9.   This decision passes the *DeSena* panel's test: that "the complexities of a particular case require the particular expertise of non-local counsel."   *DeSena*, 847 F. Supp. 2d at 214.   The Court also agrees with the justification presented by the Plaintiffs for their retention of Mark Ash as co-counsel.

Accordingly, out-of-district rates are appropriate for at least some of the work done in this case.   However, the hourly rates charged by Thomas C. Goldstein of between $875 and $925 substantially exceed even the $475 hourly rate approved by the *DeSena* panel for highly experienced Washington, D.C.-based partners in 2011. *Id.* at 214–15 ("Considering the procedural history and relative complexity of this case, the Court concludes that $475 is the maximum hourly rate Attorney Bradeen may reasonably charge for his work in this case").   The hourly rates of $650 to $725 charged by Mr. Julin, who practices in Miami, Florida, also substantially exceed the

$475 hourly rate approved for 2011 by the *DeSena* panel.  Mark Ash's hourly rates ran from $337.50 to $415.00, but he practiced in Raleigh, North Carolina.[15]

The Plaintiffs assert that the *Laffey* matrix the *DeSena* panel used to determine the appropriate hourly rates for D.C. Circuit counsel "is not applicable here," pointing out that Mr. Goldstein, as an appellate specialist with a Supreme Court practice, has a higher market value than the *Laffey* matrix allows.[16]  *Pls.' DeSena Br.* at 9.  But the Plaintiffs must still demonstrate that their hourly rates represent "the prevailing rate for such representation in Washington, D.C." *DeSena*, 847 F. Supp. 2d at 214.  In the fee-shifting context of § 1988, the question is not what the market will bear and the Court is not required to order the state of Maine to pay a lawyer's hourly rates based on nothing more than that lawyer's say-so.

In the absence of other convincing evidence, extrapolating District of Columbia rates to Miami, Florida, or Raleigh, North Carolina, is as reasonable as any other method.  *See Chanel, Inc. v. Doan*, No. C 05-03464 VRW, 2007 U.S. Dist. LEXIS 22691, *17–18 (N.D. Cal. Mar. 13, 2007) (applying the *Laffey* Matrix and the locality pay differentials within federal courts and concluding that the differential

---

[15]     The Defendants argue that the Raleigh, North Carolina, market is similar to the Portland, Maine, market, and that the Court should reduce Mr. Ash's hourly rates to the level of local counsel. *Def.'s DeSena Br.* at 5 n.1.

[16]     The *Laffey* Matrix is a grid of hourly rates within the District of Columbia based on years of experience that the Civil Division of the United States Attorney's Office for the District of Columbia prepares and updates.  *See Laffey Matrix* – 2003-2013, *available at* http://www.justice.gov/usao/dc/divisions/Laffey_Matrix_2003-2013.pdf.  The matrix is based on hourly rates allowed by the District Court in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984).

between the District of Columbia and Miami in 2007 was 0.3%).[17]  Furthermore, the Court knows no logical way to distinguish among the excellent professional reputations of Attorneys E. Mark Bradeen, Thomas R. Julin, and Mark A. Ash or to differentiate among the reputations of their respective law firms.

In sum, guided by *DeSena*, the Court fixes the maximum reasonable hourly rates for all out-of-district partners in this case at the District of Columbia hourly rates from the *Laffey* Matrix: $440 for 2007, $465 for 2008 and 2009, $475 for 2010, and $495 for 2011.  *See Laffey Matrix* – 2003-2013, *available at* http://www.justice.gov/usao/dc/divisions/Laffey_Matrix_2003-2013.pdf.

### c.   Out-of-District Associate Hourly Rates

Mr. Julin's law firm of Hunton & Williams billed its associates at hourly rates that ranged from $220 to $475.  All of these rates substantially exceed the prevailing hourly rate for associates in Maine, which the *DeSena* Court found was $175.  *See DeSena*, 847 F. Supp. 2d at 215.

To receive out-of-district rates, the claimant must establish that an attorney has "particular expertise that is not readily available in the local market."  *Id.* at 215–16.  Here, the associate most likely to qualify for an out-of-district rate is Jamie

---

[17]      In *Chanel*, Judge Walker used the locality pay differentials within the federal court as a proxy for differentials between the hourly rates in the *Laffey* matrix among District of Columbia, Miami, and Los Angeles counsel. *See Chanel*, 2007 U.S. Dist. LEXIS 22691 at *17–18.  These differentials for 2011 were: 24.22% for Washington, D.C., 20.79% for Miami, Florida, and 17.64% for Raleigh.  *See* http://jnet.ao.dcn/Human_Resources/Pay_Tables/2011_Pay_Tables/Judiciary_Salary_Plan_Base_and_Locality_Pay_Tables.html.  Subtracting the Miami differential from the the D.C. differential yields 3.43% (24.22% - 20.79% = 3.43%), which slices too thin for this Court's purposes.  Subtracting the Raleigh differential from the D.C. differential yields 6.58% (24.22% - 17.64% = 6.58%).  Since Mr. Ash's claimed hourly rates are more than 6.58% lower than the $475 per hour rate for D.C. counsel the *DeSena* panel approved, the Court finds that Mr. Ash's claimed rates are reasonable.

Isani, the senior associate at Hunton & Williams who was assigned to the Maine litigation.   The Court carefully reviewed Attorney Isani's itemized entries and concludes that her work by her own description was not unduly specialized and could have been done by a comparably credentialed associate in Maine.   The same is true of other associates at Hunton & Williams.   The Court concludes that the Maine associate hourly rate of $175 is the appropriate rate for all hours billed by Hunton & Williams associates.

Mr. Goldstein's law firm of Akin Gump billed two associates, Kevin Amer and Isaac Lidsky, at between $500 and $550 per hour.   Although an argument can be made that the level of sophistication for a Washington, D.C.-based associate working exclusively on appellate issues is greater than that of the average associate in the state of Maine, the Court does not view the level of sophistication as compelling distinct treatment.   The billing records for these associates merely reflect work on the legal issues on appeal without offering any permissible basis to evaluate the level of sophistication of the associates' work; accordingly, the Court concludes that the Maine associate hourly rate of $175 is the appropriate rate for all hours billed by Akin Gump associates.

### d.    Paralegal Rates

Hunton & Williams billed litigation support specialists and paralegals at the hourly rates of $200 and $180, respectively.   In his Declaration, Mr. Montgomery states that at Bernstein Shur "[t]he hourly rate of litigation paralegals ranged from $75–$115 per hour at the time the work was performed."   *Pls.' Mot.* Attach. 6, *Decl.*

*of John H. Montgomery*, ¶ 13.  In *DeSena*, the panel accepted the paralegal billing rate of $95 per hour.  *Id.* at 213–14.  The Court accepts $95 per hour as the rate for paralegal and litigation support billing in Maine.

As to the Hunton & Williams paralegal and litigation support rates, again the question is whether the Plaintiffs have demonstrated that the work justifies out-of-district billing rates.  The Court concludes that they have not made the case for higher rates than would be charged locally and fixes the Hunton & Williams paralegal and litigation support hourly rates at $95.

### e.      Conclusion: Average Hourly Rate

Having determined reasonable hourly rates for the various timekeepers, the Court again follows Judge Murtha in adopting an across-the-board approach to arrive at a reasonable average hourly rate.  *See Sorrell*, 2012 U.S. Dist. LEXIS 99105 at *13 (reducing the average hourly rate from $378 to $300).  Taking into account reasonable hourly rates for each timekeeper, the Court, in an exercise of discretion, finds that $300 is a reasonable average hourly rate for all timekeepers in this case.

### 4.      Subtotal

Having determined that 2000 hours were reasonably spent on the merits of the Plaintiffs' case, and that $300 is a reasonable average hourly rate, the Court multiplies those figures together to arrive at a lodestar value of $600,000.

### C.      Expenses

In their Motion, the Plaintiffs requested reimbursement for $47,023.89 in expenses:

| | |
|---|---|
| Computer Research: | $15,196.28 |
| Couriers | $ 2,703.95 |
| Litigation Support | $ 2,152.70 |
| Meals | $ 1,800.46 |
| Postage | $   111.26 |
| Publication Costs | $     47.93 |
| Telephone | $   580.37 |
| Travel | $24,430.94 |
| Total | $47,023.89 |

In *Sorrell*, Judge Murtha cast a skeptical eye at the $177,269.81 in expenses the Plaintiffs claimed in that case, refusing to reimburse the lawyers for the cost of their meals, publication expenses, and some litigation support expenses. *See Sorrell*, 2012 U.S. Dist. LEXIS 99105 at *25–26. He reduced claimed expenses for couriers, legislative research, transcriptions of legislative history, and travel by half. *Id.* at *26–28. He approved expenses for computer research, postage, and telephone. *Id.* at *28. The net result was an award of $106,989.63. *Id.* Although the First Circuit accords the trial court a wide range of discretion in attorneys' fees awards, it seems to take a more liberal attitude toward law firm expenses than the Second Circuit. *See Hutchinson*, 636 F.3d at 17 ("Contrary to the Commonwealth's implication, the availability of such remediation is not limited to items recoverable as court costs under § 1920. Rather, such recovery can extend to a broad range of other items, including travel expenses, computer time, and the like."); *see also Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 43 (1st Cir. 2006).

In its response, the State objects to the following: (1) expenses associated with a preparation session in Philadelphia on November 1, 2007, (2) Mr. Julin's November 13, 2007, trip to Washington, D.C., to prepare Mr. Frankel, (3) Ms. Isani's travel expenses to Bangor, Maine, to attend the preliminary injunction hearing, (4) Mr. Lidsky's travel expenses to attend the First Circuit argument, (5) computer research performed by firms other than Hunton & Williams, (6) meal expenses, and (7) hotel and conference room expenses before the November 2007 preliminary injunction hearing. *Def.'s Opp'n* at 31. As the State has not objected to the charges for couriers, postage, publication costs, and telephone, the Court approves those expenses. *See DeSena*, 847 F. Supp. 2d at 217 ("There has been no objection to these amounts and, therefore, the Court will award costs totaling $2,713.22").

The Court rejects most of the State's objections. Largely because of the magnitude of this case, its complexity, and significance to their businesses, the Plaintiffs were entitled to put forward their very best case and the Court will not second guess the need for preparation sessions in Philadelphia and Washington. Furthermore, Attorney Isani was deeply involved in this case before the hearing on the preliminary injunction and the Court considers the expense of her travel to Maine reasonable. Of the State's objections, the only one the Court agrees with is Attorney Lidsky's travel expenses to attend the First Circuit argument on April 5, 2010. Unfortunately, the Akin Gump bill seems to reflect the date the law firm paid airfare and hotel expenses but not when the airfare and hotel expenses were

44

incurred.  *See Bill* at 205.  Moreover, the Court approves the appearance of Mr. Goldstein at the First Circuit argument and the bill does not inform the Court which expenses were his as opposed to Mr. Lidsky's.  As the expenses appear to be for two lawyers when one would have done, the Court has in its discretion reduced Akin Gump's travel expenses by one-half: $6,217.52 x .5 = $3,108.76.

The Court awards expenses of $43,915.13: $47,023.89 - $3,108.76 = $43,915.13.

### D.  The Motion for Supplemental Award of Attorneys' Fees

In their original motion and in a supplemental motion, the Plaintiffs have requested reimbursement for preparing and filing the motion for award of attorneys' fees.  *Bill* at 182 ($2,468.50 in fees as of June 30, 2012); *Pls.' Supplemental Mot.* at 1 ($116,077.50 in attorneys' fees and $1,232.51 in expenses). The State objected on a number of bases: (1) the ratio between the underlying fee and the fees for litigating the fee request is too high; (2) the hourly rate should be no more than $150; (3) the number of hours is excessive; (4) the time spent on remand is excessive; and (5) the Plaintiffs' computer research expenses should be reduced because that research was duplicative of the computer research in *Ayotte*. *Def.'s Supplemental Opp'n* at 1–7.

In response, the Plaintiffs observe that they meet the Defendant's own ratio analysis of 10:1 between the underlying fees and the motion fees, and in any event, they say that this Court has never "articulated a bright-line limit on those ratios, nor should it." *Pls.' Reply* at 4–5.  The Plaintiffs reject the State's attempt to limit

their hourly rates to in-state rates, noting that the bulk of the time was generated by attorneys with Hunton & Williams and that it would have been inefficient for Maine lawyers to do this work. *Id.* at 5. The Plaintiffs dispute the State's contention that they should have used the research they performed in the attorneys' fee application in *Ayotte* more effectively to reduce the time spent on this motion, observing that their work on the *Ayotte* attorneys' fee motion had been completed five years earlier. *Id.* at 6. Finally, they contest the State's argument that their work on remand should be reduced and that their computer expenses duplicated the expenses in *Ayotte*. *Pls.' Reply* at 7.

### 1.    Fees

Under First Circuit law, attorney time and expenses for preparing and filing a motion for award of attorneys' fees and expenses are typically reimbursable. A prevailing party "normally is entitled to attorneys' fees incurred in the pursuit of fees under section 1988." *Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331, 340 (1st Cir. 2008); *see also DeSena*, 847 F. Supp. 2d at 213 (approving motion fees). At the same time, the First Circuit has cautioned that the work involved "often amounts to little more than documenting what a lawyer did and why he or she did it." *Brewster v. Dukakis*, 3 F.3d 488, 494 (1st Cir. 1993). Accordingly, time spent on fee litigation is compensated "at lower rates than those deemed reasonable for the main litigation." *Torres-Rivera*, 524 F.3d at 340. In other cases, this District has substantially reduced the hourly rates for fee motion work. *See, e.g., DeSena*. 847 F. Supp. 2d at 213 (approving an hourly rate of $147.50 for work on the fee motion);

46

*Cushing v. McKee*, No. 1:10-cv-330-GZS, 2012 U.S. Dist. LEXIS 46591, *29–30 (D. Me. Apr. 3, 2012) (approving a reduced rate of $150 per hour for fee motion work); *Sullivan*, 625 F. Supp. 2d at 48–49 (same).   The Court rejects the Plaintiffs' arguments that a higher hourly rate is justified and fixes the reasonable hourly rate for work on the motion for fees at $150.

Before resolving the supplemental motion, the Court must first determine what amount of time and expenses of the total of $117,310.01 was directed toward the fee motion as opposed to other work.   The Plaintiffs' supplemental motion submits bills for all legal work after June 30, 2011, including but not limited to work performed on the fee motion.   *See Pls.' Supplemental Mot.* at 1.   For legal work performed after June 30, 2011, that was not associated with the fee motion, the Court concludes that the out-of-state attorneys may be paid at the rates of $495 per hour for Mr. Julin (based on the *Laffey* matrix) and $175 per hour for Ms. Isani (the reasonable rate for comparably credentialed Maine associates).   The Court reviewed the time and charges billed after June 30, 2011, and finds that 11 hours were billed on non-fee issues for $7,000.00 (Attorney Julin: 7.1 hours at $725; Attorney Isani: 3.9 hours at $475).   The Court reduces this portion of the fee request from $7,000.00 to $4,197.00: Mr. Julin—7.1 x $495 = $3,514.50 and Ms. Isani—3.9 x $175 = $682.50.

Subtracting 11 hours from the 203.3 total hours submitted in the supplemental motion leaves 192.3 hours that were spent litigating the Plaintiffs' claim for fees.   *See Pls.' Supplemental Mot.* Attach. 1, *Decl. of Thomas R. Julin*, 6.

The Court allows an hourly rate of $150 for these 192.3 hours, producing fees of $28,845.  Adding the $4,197 for additional work results in a lodestar of $33,042 for the supplemental motion.

### 2.   Expenses

For the reasons earlier expressed on the issue of expenses, the Court disagrees with the State's objections to the Plaintiffs' supplemental expense claim of $1,232.51 and allows it in full.

### E.   The Grand Total

The Court sets the lodestar for the original motion at $600,000 by multiplying the 2,000 hours appropriately worked by the reasonable average hourly rate of $300.  The Court sets the lodestar for the supplemental motion at $33,042.

There is a "strong presumption" that the lodestar figure is reasonable, and the Court finds no circumstances that warrant discretionary adjustments of the lodestars in this case upward or downward.  *See Perdue v. Kenny A. Ex Rel. Winn*, 130 S. Ct. 1662, 1673 (2010).  Likewise, the Court finds no basis for awarding pre-judgment interest.[18]

Adding expenses of $43,915.13 under the original motion and $1,232.51 under the supplemental motion to the lodestars results in a grand total of $678,189.64 in fees and expenses.

### F.   Bill of Costs

---

[18]   However, the state of Maine will be subject to the post-judgment interest rate if it does not pay the fee award within thirty days of the date of this Order.

The Court defers action on the Plaintiffs' Bill of Costs and refers this matter to the Clerk of Court.  *See Sorrell*, 2012 U.S. Dist. LEXIS 99105 at *28.

### G.   Social Significance

The Court has already touched on this issue.  But it is important to observe that the Plaintiffs achieved a victory that was important not only for themselves but also for the public.  If the Plaintiffs had lost and the northern New England statutes had been allowed to stand, the statutes may well have foreshadowed a national movement to enact similar statutes, potentially crippling the Plaintiffs' business model.  Beyond the narrow economic interests of the PDIIs, the Supreme Court in *Sorrell* reaffirmed the important principle that commercial speech, including speech in aid of pharmaceutical marketing, "is a form of expression protected by the Free Speech Clause of the First Amendment."  *Sorrell*, 131 S. Ct. at 2659.  This award is a reminder that the freedom guaranteed by the First Amendment comes at a cost.

## V.   CONCLUSION

The Court awards a total of $678,189.64 in fees and expenses.  The Court GRANTS in part, DENIES in part, and DEFERS in part the Plaintiffs' Motion for Award of Fees and Expenses (ECF No. 124) and GRANTS in part and DENIES in part the Plaintiffs' Motion for Supplemental Award of Attorneys' Fees & Expenses (ECF No. 139).  The Court DENIES the Plaintiffs' Request for Hearing on Plaintiffs' Motion for Attorneys' Fees, Expenses, and Costs (ECF No. 134).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 28th day of September, 2012